IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| In re: | ) | Case No. BK 22-40480 |
| | ) | |
| WESLEY HOWARD HITCHCOCK, | ) | |
| | ) | |
| Debtor. | ) | Chapter 12 |
| _____ ) | ) | _____ |
| | ) | |
| WESLEY HOWARD HITCHCOCK, | ) | Adv. Pro. 22-4021 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GORDON & SHIRLEY HITCHCOCK, | ) | Adv. Pro. 22-4023 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN MORTGAGE COMPANY, | ) | |
| a division of FIRST STATE BANK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The debtor, Wesley Hitchcock, and his parents, Gordon and Shirley Hitchcock, filed separate complaints seeking to subordinate or disallow claims of American Mortgage Company ("AMC") and to rescind or reform deeds of trust in which AMC is beneficiary. By agreement of the parties, the two actions were tried together. J.P. Sam King appeared for the debtor and plaintiff Wesley Hitchcock. Richard P. Garden, Jr., appeared for plaintiffs Gordon and Shirley Hitchcock. Bradley D. Holbrook and Nicholas J. Ridgeway appeared for the defendant AMC. The parties also submitted a written designation of deposition testimony with objections.[1]

Because the deeds of trust from the debtor's parents to AMC contain a cross-collateralization clause not within the intent of the parties, the plaintiffs' claims for reformation are partially granted to remove the clause. All other requested relief is denied.

_____

[1] *See* Joint Deposition Designations and Objections. (Doc. #452). All objections listed in the designation are overruled and the designated testimony is received.

## Findings of Fact

This is the second of two Chapter 12 bankruptcy cases filed by the debtor. The first case, filed September 17, 2019, contained little controversy. During the first case AMC filed three proofs of claim on account of three loans. The first loan was a $1,399,000 FSA guaranteed loan to purchase livestock. The second was a $1,450,121.50 line of credit to cover the debtor's 2017 operating expenses. The third was a $1,200,000 loan to refinance additional debt the debtor carried over from 2017. AMC filed all three claims as secured by two deeds of trust. The land identified in the deeds of trust is owned by the debtor's parents and by Hitchcock One LLC.

Although AMC claimed all three loans were secured by land, only the promissory note for the $1.2 million carryover loan expressly references land as collateral. But each deed of trust contains a cross-collateralization clause.[2] The effectiveness of the clauses was not disputed in the first bankruptcy case. The debtor and his bankruptcy counsel stipulated all three loans were cross-collateralized.[3] The debtor's first case was dismissed because the debtor was not able to confirm a plan.

The debtor filed his second Chapter 12 bankruptcy case on June 8, 2022. Before filing, the plaintiffs' attorneys informed AMC they believed AMC's three loans were not cross-collateralized, and land personally owned by Gordon and Shirley was not AMC's collateral.[4] AMC investigated.[5] Shortly after the second case was filed, on July 6, 2022, the debtor requested financing for his operations. During the hearing, he formally asserted AMC's loans were not cross-collateralized. He also asserted AMC acted inequitably by claiming otherwise in filings in the previous bankruptcy case[6] and in Nebraska state court.

AMC apparently took the debtor's allegations seriously. On July 11, 2022, AMC again filed three proofs of claim. Unlike the first case, AMC did not list land as

---

[2] *See* Deeds of Trust. (Doc. #220; Doc. #221; Doc. #247; Doc. #248).

[3] *See* Joint Preliminary Pretrial Statement. (Doc. #300) (stipulating the debts underlying AMC's claims are cross-collateralized and the "real estate that serves as collateral for AMC's claims is owned by Hitchcock One LLC and Gordon and Shirley Hitchcock").

[4] *See* Credit Committee Meeting Minutes. (Doc. #297) ("Hitchcock's attorney is suggesting the attached loan agreement provides documentation that the land of Gordon & Shirley's real estate should not be crossed collateralized to Wes' operating note with us.").

[5] *See* e-mails. (*e.g.* Doc. #298) (suggesting AMC employees review loan committee minutes as something in the minutes, "might be helpful to our case").

[6] *See, e.g.,* Affidavits. (Doc. #368; Doc. #372; Doc. #374; Doc. #376; Doc. #382).

securing all three loans.[7] Only the $1.2 million carryover loan was filed as secured by land.

To understand the dispute, we must rewind to 2016. The debtor needed a new banking relationship. A hailstorm damaged his corn crop during pollination. He incurred significant losses. The debtor chopped the corn for silage to feed to livestock. But he did not own livestock. He decided to purchase cattle. He approached the Farm Service Agency for a loan. He did not qualify for a direct FSA loan. But he did qualify for an FSA guaranteed loan. Enter AMC, which originated FSA guaranteed loans.

AMC initially made two loans to the debtor. The first was the $1,399,000 FSA guaranteed loan to finance livestock purchases. The second was a $400,000 line of credit to cover remaining operating expenses for 2016. Although AMC requested land as collateral, at the time neither loan was secured by land. The reason was simple. The debtor did not own farmland. He rented it.

The debtor's relationship with AMC broke down shortly after it started. In 2017 AMC assigned a new lending officer, Jackie Pinkerton, to the debtor's account. The debtor and Pinkerton did not see eye to eye. And the debtor's losses mounted. At the end of 2017, the silage was less than the debtor originally reported. Some of the existing silage spoiled because the debtor did not properly store it. Many of the debtor's cows did not calve. Livestock was allegedly stolen. By the end of 2017, the non-real estate collateral could not cover the debtor's losses of approximately $1.2 million.

AMC was willing to carryover and term out the $1.2 million shortfall. But it wanted land as collateral.[8] The debtor did not own land. His parents did. In March 2018, the debtor asked his father to pledge land as collateral. Gordon and Shirley owned approximately thirty parcels of land personally and in entities. One of the entities, Hitchcock One LLC, was formed for estate planning purposes. Gordon and Shirley

---

[7] AMC amended its claims on April 23, 2024, to reassert all three loans are secured by land. Including principal and interest, as of the date of the second bankruptcy filing, AMC claims total $3,960,644.05, including the FSA guaranteed loan in the amount of $594,594.30 (Claim 13-2), the carryover note in the amount of $1,846,511.58 (Claim 14-2), and the operating note in the amount of $1,519,538.17 (Claim 15-2). It appears the FSA guaranteed loan was reduced because the FSA forgave the guaranteed portion of the loan.

[8] AMC also wanted to shift its loan risk to Security First Bank, which held a first position lien on the land ultimately pledged to AMC. AMC requested the debtor ask Security First to release some real estate collateral. In a January 2018 email, the debtor responded, "I also know we have a lot of equity in the land and we are willing to use it or to liquidate it if we have to." (Doc. #266).

viewed the land in Hitchcock One as the debtor's inheritance. Ultimately, they agreed to pledge land to AMC.

A closing occurred in North Platte on March 23, 2018. Pinkerton performed the closing for AMC. During the closing, the debtor signed the $1.2 million carryover note. Gordon and Shirley signed two deeds of trust, both individually and on behalf of Hitchcock One.[9] Shirley did not speak with Pinkerton before the closing. She did not receive or review the documents before the closing. She conceded she did not ask for copies.

During the closing Pinkerton reviewed the deeds of trust with Gordon and Shirley.[10] Pinkerton's standard practice was to start at the beginning of each document, explain sections, answer questions, and then execute the documents. But Shirley did not recall Pinkerton discussing the cross-collateralization clause.[11] After the closing, Pinkerton provided Gordon and Shirley with copies of only the documents they personally signed, including the deeds of trust.

Shirley testified she and Gordon did not intend to pledge land to secure all three loans. They intended to pledge land only to secure the $1.2 million carryover note. During the closing, Shirley was concerned about the debt.[12] Shirley was aware her son had other debts to AMC. She did not know the particulars. She asked Pinkerton whether she and Gordon were going to get "hung on" the debtor's other debts. Pinkerton assured Gordon and Shirley they would not. Pinkerton did not tell Gordon and Shirley about the other two AMC loans or the amount of the indebtedness. Pinkerton refused to discuss any of the loans with Shirley because Shirley was not a maker of any of the notes. Instead, Pinkerton suggested Shirley, "talk to Wes".

---

[9] Other documents signed include security agreements and resolutions for Hitchcock One. The notes, deeds of trust, security agreements and resolutions were AMC's standard loan documents generated from its banking software.

[10] Pinkerton did not testify at trial. She was deposed twice. (Doc. #209; Doc. #303).

[11] Gordon and Shirley borrowed money from other banks, which in part covered the debtor's debts. Gordon and Shirley signed other loan documents with cross-collateralization clauses. Those clauses were unimportant to Shirley because she knew of the extent of her own debts.

[12] Only the $1.2 million carryover note was signed during the closing. The other two loans were not part of the closing. The FSA guaranteed loan was signed November 23, 2016, before land was pledged as collateral. The operating note came due in February 2017 and was extended through June 2018. A new operating note was executed on July 31, 2018. It does not list land as collateral.

Pinkerton corroborated Shirley's testimony the intent was all three loans would not be cross-collateralized.[13] Internal AMC documents from Pinkerton before the March 2018 closing, and shortly after the closing in early 2019, support Pinkerton intended, on behalf of AMC, only the carryover note would be secured by land.[14]

Shirley also testified she intended only to pledge Hitchcock One land as security. But Shirley conceded she was not involved with discussions about the collateral. Gordon discussed the pledge with the debtor.[15] Shirley did not know what Gordon and the debtor spoke about or to what they agreed. When she signed the deeds of trust, Shirley assumed the land was owned by Hitchcock One. She did not verify otherwise.[16] She conceded Pinkerton never represented to her the land identified in the deeds of trust was only Hitchcock One land.

The deeds of trust identify both "Gordon W. Hitchcock and Shirley A. Hitchcock … a married couple" and "Hitchcock One LLC" as trustors. Gordon and Shirley signed each deed of trust twice – once "individually" and once as a member of Hitchcock One. The debtor provided the legal descriptions. He obtained the descriptions from an appraisal performed for his parents when Gordon and Shirley borrowed money

---

[13] Pinkerton's testimony was slightly inconsistent. *Compare* Deposition (Doc. 209; 51:1-8) ("Q. Well, would it be fair to say that the bank agreed with Wes and Candace that the only note that would be secured by real estate was the carry-over note? A. That is the way they were prepared, yes.") *with* Second Pinkerton Deposition (Doc. 303; 81:5-82:20) (stating based on her review of trial exhibit 288, AMC intended the cross-collateralization clause apply to both the carryover note *and* the operating note). Pinkerton later reverted to her original testimony. *See* Second Pinkerton Deposition (Doc. 303; 108:15-109:20) (stating Shirley was clearly concerned about the extent of the land pledge during closing and Pinkerton stated Gordon and Shirley's land would only secure the carryover note); (Doc. 303; 200:8-19) (Q And is that your testimony today that the agreement was the only note secured by the real estate was the carryover note? A Myself, yes.). Pinkerton believed only the carryover note was to be secured with land. *See infra,* notes 21-23.

[14] The loan committee minutes indicate the land identified in the appraisal "would be security for the $1,200,000 term debt". (Doc. #267). Land as security for the other loans is not mentioned. Neither is cross-collateralization. Loan committee notes also indicate land would secure *new* term debt, rather than *all* existing debt, which is consistent with Pinkerton's original testimony. (Doc. 288) ("Wes has requested that we term out $1,200,000 of his current debt…. To secure *the new term debt, we will cross-collateralize all assets*, plus take a second lien behind Security First on Hitchcock One's real estate. This real estate was appraised in May of 2016 over $10,000,000, SFB loan is estimated at $4,500,000.") (emphasis added). This valuation includes real estate owned by both Gordon and Shirley and Hitchcock One LLC.

[15] Gordon recalls attending a closing, but does not recall discussions or agreements, nor signing specific documents.

[16] Shirley testified, "You sign what the bank puts in front of you to sign if you want the money."

from Security First Bank.[17] The debtor provided the appraisal to AMC as the land to be pledged. The legal descriptions in the appraisal match the legal descriptions in the deeds of trust. The land in the appraisal includes land owned by Hitchcock One and land owned by Gordon and Shirley personally. The debtor was aware of the ownership when he provided the appraisal to AMC.[18] He informed AMC his parents were willing to pledge all the land as collateral.

Unlike cross-collateralization, Pinkerton did not corroborate Shirley and Gordon's intent as to personally owned land. Pinkerton stated all parties intended to encumber land owned by both Gordon and Shirley and Hitchcock One.[19] Pinkerton discussed the real estate being pledged during the closing. AMC's internal communications support Pinkerton's testimony as to the intent.[20]

By June 2019, the debtor had not paid the notes. AMC reviewed its security position. Pinkerton emailed AMC CEO Karl Randecker, informing him she believed only the

---

[17] The appraisal was part of a $4.5 million loan from Security First Bank to Gordon and Shirley. In the Security First transaction, Gordon and Shirley and Hitchcock One granted Security First a lien on the same real estate that is the subject of the dispute in this case. A portion of the $4.5 million loan was to restructure debt for the debtor. (Doc. #365).

[18] AMC told the debtor several times the land was personally owned by the debtor's parents. On March 12, 2018, AMC emailed the debtor, "part of the land belongs to Gordon and Shirley Hitchcock" (Doc. #307). On March 13, AMC emailed the debtor "I just wanted to make sure you are aware that because the land is on their names, they are going to be required to sign the deed of trust", and "it looks like your parents own some of the land personally and it is not Hitchcock One." The debtor responded, "they are fine with that".  (Doc. #308). The debtor testified he did not receive the emails because they were sent to an old email address. Subsequent emails established otherwise. (Doc. #351). Although the debtor knew his parents were pledging personal land, he never contacted AMC to inform it his parent's personal land was not collateral.

[19] *See* Pinkerton Deposition (Doc. #209; 58:12-22) (stating as to the real estate to be pledged – "This is what we were provided [by the debtor]. That's what we used."; (Doc. #209; 56:1-15) (stating at the time of closing Pinkerton understood the land collateral included Gordon and Shirley's personal land); Pinkerton Second Deposition (Doc. #303, 111:5-18) (stating the intention was to secure the carryover note with all of the land in the appraisal, regardless of who owned it, and regardless of the number of acres listed); (Doc. #303; 241:19-24) (stating she recalled at closing specifically discussing the personal real estate with Gordon and Shirley)

[20] *See, e.g.,* Pinkerton email to Randecker dated 06/21/2019 (Doc. #222) ("Plan outline attached – I included Hitchcock One and Gordon and Shirley Hitchcock as they have pledged security for one of the loans.").

$1.2 million carryover note was secured by land.[21] Pinkerton consulted AMC's attorneys. On September 17, 2019, she reported:

> [Our attorney] thinks we could argue that since our notes have the cross-collateralization terminology in them, that the land could be tied to all three loans. I disagree with him.…[22]

After the debtor filed his first bankruptcy case in November 2019, AMC's attorneys filed three proofs of claim as secured by land. Pinkerton reported via e-mail dated December 27, 2019:

> I have discussed with [our attorneys] several times and they assure me that even though our Deed of Trust was just for [the carryover] note #1802710, that in Bankruptcy they look at it "globally" and since our DOT and Promissory Notes include a Cross-Collateralization Clause, that we will be able to use the equity in the real estate to cover our potential shortfall. I do not feel confident in this, hopefully I am wrong.…[23]

Pinkerton, a non-attorney, explained her disagreement with AMC's attorneys in her depositions. She believed the cross-collateralization clauses in the deeds of trust did not secure all three notes because two of the notes closed before the deeds of trust were signed. She believed the clauses were only effective for loans made at the same time the deeds of trust were signed and for loans made after the deeds of trust were signed.[24] She discussed this reasoning with others at AMC. Pinkerton never told anyone at AMC she had represented to Gordon and Shirley the land would only secure the $1.2 million carryover note.[25]

Randecker testified AMC relied upon its attorneys' judgment over Pinkerton's lay opinion when it filed all three claims as secured by land. Ultimately the issue went away in the first bankruptcy case because the debtor stipulated the three loans were

---

[21] *See* email (Doc. #294) ("We don't have a lien on the real estate with the operating (Wes wouldn't give us one) but we took an assignment of his shares of Hitchcock One.").

[22] *See* emails (Doc. #225; Doc. #295).

[23] *See* email. (Doc. #226).

[24] See Pinkerton Deposition (Doc. #209; 72:7-74:3) (stating she "didn't feel confident" in the lawyers position based upon "the way the notes were structured"); (Doc. #209; 121:15-122:2) ("I didn't feel in my personal opinion that due to the sequence of the loan closings and granting of security that the guaranteed loan -- FSA guaranteed loan would be tied to the real estate."); Pinkerton Second Deposition (Doc. #303; 142:11-144:2) (stating her opinion the cross-collateralization clause was ineffective because Gordon and Shirley pledged their real estate after the other two loans closed).

[25] *See* Pinkerton Second Deposition (Doc. #303; 138:24-148:2).

cross-collateralized and secured by land owned by both Hitchcock One and Gordon and Shirley.[26]

After the first bankruptcy case was dismissed, AMC filed a lawsuit in Nebraska state court on November 4, 2020, to foreclose its lien against the land. AMC again asserted the land secured all three loans. Shirley testified she was "shocked". It was the first time she realized she and Gordon pledged land other than Hitchcock One land to AMC.[27] It was the first time she realized the effect of the cross-collateralization clauses. Gordon and Shirley asked AMC to release the deeds of trust for payment of the carry over note. AMC declined. It demanded payment of all three loans.

During the foreclosure action, the debtor located a document titled "Loan Agreement", which spurred this dispute. The Loan Agreement was signed during the March 2018 closing. It was not attached to AMC's proofs of claim in the debtor's first bankruptcy case. Pinkerton prepared the Loan Agreement using Microsoft Word.[28] The Loan Agreement lists the debtor's three loans. One section of the Loan Agreement states how each loan "will be secured" or "would be secured". Another section states what the collateral for each loan "shall be". The only reference to land collateral is regarding the $1.2 million carryover loan:

> Security for loan #1 shall be a First Lien on Breeding Livestock, Machinery, Equipment, and Farm Vehicles…. Security for loan #2 shall be a First Lien on crop sales…. Security for loan #3 [the carryover loan] shall be a Second Lien on Real Estate owned by Hitchcock One, LLC and a note on a total of 154 acres of land, more or less, together with all improvements thereon (hereinafter refer to as "Deed"), on the property described herein.

The land described in the Loan Agreement is the same land listed in the deeds of trust, and was owned not just by Hitchcock One, but also by Gordon and Shirley.

---

[26] *See supra* Note 3. Shirley testified they were not parties to the first bankruptcy case. But Gordon is listed as a creditor in the debtor's bankruptcy schedules in the first bankruptcy case and is listed on the matrix to receive U.S. Mail service of filings to parties in interest. (Doc. #369).

[27] The debtor testified he did not inform his parents during the first bankruptcy case AMC contended the loans were cross-collateralized with land Gordon and Shirley owned personally, or he so stipulated.

[28] *See* Loan Agreement (Doc. #215). In 2018 AMC used loan agreements for all loans except lines of credit. The loan officer got to play lawyer using a stock form. The Loan Agreement added additional covenants the borrower had to follow to keep the loan in good standing. *See* Pinkerton Deposition (Doc. #303; 64:15-65:6).

The Loan Agreement also provides:

> Borrower understands and agrees that the loan documents being executed herewith constitute the entire agreement between Borrower and Lender and any and all prior written and oral agreements or contemporaneous oral agreement that contradicts any provision contained within the loan documents are expressly rejected in favor of the provisions contained within the loan documents.

The debtor testified the Loan Agreement was his sole focus during the March 2018 closing. It was the only document he discussed with Pinkerton. It was the only document he read. When offered the opportunity to read the loan documents, the debtor testified he asked Pinkerton, "Do they agree with the Loan Agreement?" She said, "Yes". He responded, "Then I don't have to read them."

After the closing, AMC provided the debtor a copy of the Loan Agreement. It was in his files when he filed his first bankruptcy case. But he did not give it to his bankruptcy attorney until May 2021, shortly before he filed his second bankruptcy case. The debtor contends when he filed his first bankruptcy case, he did not recall the Loan Agreement existed. He did not review all his paperwork when preparing his bankruptcy schedules and statements.[29] He did not provide the Loan Agreement in response to discovery issued by AMC.[30] He testified he was in a poor mental state and did not fully understand what was happening during his first bankruptcy case.

Although he stipulated all three loans were cross-collateralized by land owned by Gordon and Shirley, and Hitchcock One, the debtor contends he capitulated to his bankruptcy attorney. He informed his attorney what Pinkerton said. But he did not know he had a copy of the Loan Agreement to support his position. The debtor did not speak with his parents about the first case and did not ask his attorney to speak with them to corroborate his beliefs.

Further muddying the waters, AMC took an inconsistent position regarding its collateral in reports to the FSA and in its request for payment of the guaranty. After the debtor defaulted, AMC provided the FSA status reports. The reports through August 9, 2022, reference only personal property collateral as securing the FSA guaranteed loan. They do not reference land as collateral.[31] The FSA paid AMC on a

---

[29] In addition to his mental health, the debtor blames his failure to search his records on his ex-wife, who was responsible for his filing system.

[30] It is not clear whether the debtor served discovery on AMC, or even requested a copy of his loan file during his first bankruptcy case.

[31] AMC informed the FSA about the potential real estate collateral at some point. Exactly when is not clear. When he applied for the guaranty payment, Mr. Weems stated in the

portion of the guarantee. FSA regulations require all collateral be liquidated before payment is made. But AMC applied for the guarantee in September 2022. The FSA paid AMC before the land was liquidated.[32]

## Conclusions of Law

### *Subordination*

The plaintiffs request the court subordinate AMC's claims and transfer AMC's liens to the debtor's estate. The court has the power to subordinate claims.

> [A]fter notice and hearing, the court may -- (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). But "equitable subordination is an unusual remedy which should be applied only in limited circumstances." *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1464 (5th Cir. 1991).

Equitable subordination is designed to "undo or offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Bunch v. J.M. Capital Fin. Ltd. (In re Hoffinger Indus., Inc.)*, 327 B.R. 389, 415 (Bankr. E.D. Ark. 2005) (quoting *Bostian v. Schapiro (In re Kansas City Journal–Post Co.)*, 144 F.2d 791, 800 (8th Cir.1944)). To prevail, the plaintiffs must establish: 1) AMC engaged in inequitable conduct; 2) injuring other creditors or conferring upon itself an unfair advantage; and 3) the relief sought

---

application, "As of the time of the submission of this loss claim AMC is still seeking foreclosure in the court however no real estate was pledged as security for the G-OL". Weems also inquired whether the FSA expected AMC to share in any additional recovery. (Doc. #280). In a November 9, 2023, report he states, "We are continuing to litigate the validity of the cross-collateralization clause in our DOTS in the bankruptcy case[.]" (Doc. #398).

If land is collateral, during the origination process the lender must submit to the FSA the legal descriptions, proof of marketable title, an appraisal, and an environmental assessment. AMC did not submit this information. And if land secures multiple loans, the application must state how the proceeds will be divided. The application did not so state. (Doc. #278; Doc. #212; Doc. #279; Doc. #385; Doc. #396). This evidence was not especially probative. The land was not pledged as collateral in 2016. It was pledged in 2018, two years after these documents were created.

[32] The FSA did not pay the full amount of the guaranty. It paid $354,484.12, deducting $246,550.93 due to "unauthorized use of loan funds", and because "the borrower was dishonest and misleading". Specifically, "the borrower moved/sold cattle without disclosure and purposely allowed a large number of cattle to die through neglect." (Doc. #397).

is not inconsistent with the Bankruptcy Code. *See Bala v. Kaler (In re Racing Servs., Inc.)*, 340 B.R. 73, 76 (B.A.P. 8th Cir. 2006). Subordination requires a factual inquiry.

It is not entirely clear to whom the plaintiffs seek to subordinate AMC's claims. The claims cannot be subordinated to the debtor, as the debtor is not another claimant. Under § 510, a claim may be subordinated to "another allowed claim". 11 U.S.C. § 510(c). An interest can be subordinated to "another allowed interest". *Id*. The section does not allow a claim to be subordinated to an interest, which is what the debtor holds. But the section allows the transfer of AMC's liens to the estate, which if granted essentially makes AMC's claims unsecured.

So, the question becomes to which other claims, if any, could AMC's claims be subordinated. "Subordination is an equitable remedy in which the order of payment rather than the existence of the debt is in issue." *Slefco v. First Nat'l Bank of Stuttgart (In re Slefco)*, 107 B.R. 628, 644 (Bankr. E.D. Ark. 1989) (quoting 3 *Collier on Bankruptcy*, ¶ 510–02 (15th ed. 1986)). "The essence of equitable subordination is that the court may reduce the priority of a creditor's claim…." *Armstrong v. First Am. Bank & Tr. of Minot (In re Haugen Const. Servs., Inc.)*, No. 85-05321, 1989 WL 1108985, at *3 (Bankr. D.N.D. Mar. 3, 1989). "[T]he doctrine is remedial, not penal, and should be applied only to the extent necessary to offset the *specific harm* that the creditors suffered on account of the inequitable conduct." *Fabricators, Inc.*, 926 F.2d at 1464 (emphasis added). The plaintiffs assert all creditors were harmed because the debtor was unable to confirm a plan in his first bankruptcy case after AMC asserted its three claims were secured by land. This is not a specific harm. It is not even a general harm – the debtor's case was dismissed. No creditor's claim was negatively impacted.

Gordon and Shirley argue they were specifically harmed.[33] They assert they were damaged in the amount of additional interest of approximately $259,000, because AMC would not let them pay the carry-over note in exchange for a release of the deeds of trust. This is not a specific harm for purposes of subordination. Even assuming it qualified, subordination must be denied because converting $3,960,644.05 of secured claims to wholly unsecured claims would be penal, not remedial.

The plaintiffs are also not entitled to equitable subordination because they did not establish inequitable conduct.

---

[33] It does not appear Gordon and Shirley's claim was offered in the adversary proceeding, but the claim they filed is for $50,000. They did not file a claim in the first bankruptcy case, and were not harmed by the filings in the first case.

> Inequitable conduct has been regarded as a wrong or unfairness or, "at the very least, a masquerade of something for what it is not." Inequitable conduct typically falls into one of the following categories: (1) fraud, illegality, or breach of fiduciary duties; (2) undercapitalization; or (3) the creditor's use of the debtor as a mere instrumentality or alter ego.

*Interstate Structures, Inc. v. Heritage Bank (In re Oelkers)*, No. A06-4054-TLS, 2008 WL 4877149, at *4 (Bankr. D. Neb. Nov. 6, 2008) (citations omitted). None of the three categories exist. The other purportedly inequitable conduct was not inequitable.

As inequitable conduct, the plaintiffs assert AMC fraudulently filed false affidavits in state court and false affidavits and proofs of claim in this court. It is a crime to "knowingly and fraudulently": present a false claim against the estate of a debtor; make a false oath, account, or declaration under penalty of perjury in a bankruptcy case; or conceal recorded information about the financial affairs of the debtor. *See* 18 U.S.C. §152.

The plaintiffs assert AMC's filings are fraudulent because AMC falsely represented: its three loans were cross-collateralized; Gordon and Shirley's land secured all three of AMC's loans; and AMC was over-secured. AMC also refused to allow Gordon and Shirley to pay the carryover note in exchange for a release of the deeds of trust. The plaintiffs argue AMC intentionally concealed the Loan Agreement, which it was required to attach to its proofs of claim. *See* Fed. R. Bankr. P. 3001(c)(1) (stating when a claim is based upon a writing, the writing "shall be filed with the proof of claim."). Aside from the attachment, the allegedly inequitable conduct, at its heart, stems from AMCs attempts to enforce the terms of its deeds of trust.

AMC did not act inequitably. The affidavits, proofs of claim, and other filings in state court and in the debtor's first bankruptcy case were neither false nor fraudulent when AMC filed them. Gordon and Shirley signed the deeds of trust individually and as members of Hitchcock One. The deeds of trust described real estate owned by Hitchcock One and Gordon and Shirley as collateral. The deeds of trust contained a cross-collateralization clause. Under the cross-collateralization clauses, Gordon and Shirley were not entitled to a release of the deeds of trust for the payment of only one loan. And, during the first bankruptcy case, AMC established it was over-secured.

The Loan Agreement does not change the analysis. The plaintiffs assert AMC concealed the Loan Agreement because it proves *only* the carryover note was secured by Hitchcock One's land. But AMC did not conceal the Loan Agreement. To establish concealment, the plaintiffs must show "the material fact was not within the plaintiff's reasonably diligent attention, observation, and judgment." *Knights of Columbus Council 3152 v. KFS BD, Inc.*, 791 N.W.2d 317, 334 (Neb. 2010). AMC

gave the debtor a copy of the Loan Agreement during the closing in 2018. When the debtor filed his first bankruptcy case, he recalled the representations Pinkerton made. When he filed, he physically possessed the Loan Agreement. The Loan Agreement was the sole document he says he reviewed during the closing. He did not look for it. He did not provide it to his attorney. He did not request it in discovery. He did not ask his parents their understanding or recollection. He stipulated to cross-collateralization.[34] His excuses are unavailing.

Even if AMC concealed the Loan Agreement, its terms do not support the plaintiffs' claims. The plaintiffs' construction is not valid.

> In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous. A contract must receive a reasonable construction and must be construed as a whole. If possible, effect must be given to every part of a contract. A contract which is written in clear and unambiguous language is not subject to interpretation or construction; rather, the intent of the parties must be determined from the contents of the contract, and the contract must be enforced according to its terms.

*Brush & Co. v. W. O. Zangger & Son, Inc*., 991 N.W.2d 294, 301–02 (Neb. 2023) (citations omitted).

The plaintiffs assert the Loan Agreement creates an ambiguity because it conflicts with the notes and deeds of trust. "A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings." *Bierman v. Benjamin*, 943 N.W.2d 269, 274 (Neb. 2020). "A contract found to be ambiguous presents a question of fact and … the court may consider all facts and circumstances leading up to the contract's execution, the nature and situation of the subject matter, and the apparent purpose of the contract." *Brush & Co.*, 991 N.W.2d at 302.

The plaintiffs assert at least four possible constructions if the Loan Agreement, notes, and deeds of trust are construed together.[35] But the Loan Agreement provides

---

[34] There is no evidence the debtor or his counsel requested the Loan Agreement or any part of his loan file through discovery in the debtor's first bankruptcy case. AMC produced it when litigation with the debtor's parents. This is wholly inconsistent with the claim of pervasive fraud by AMC, its board of directors, its officers, and its attorneys.

[35] The four constructions include: the carryover note is secured only by real estate owned by Hitchcock One; the carryover note is secured by the land described in the deeds of trust; the carryover note is secured only by "a total of 154 acres of land, more or less"; or the carryover note secures all of Wesley's debt.

it cannot create an ambiguity. If it creates an ambiguity, the notes and deeds of trust control.

> Borrower understands and agrees that the loan documents being executed herewith constitute the entire agreement between Borrower and Lender and any and all prior written and oral agreements or contemporaneous oral agreement that contradicts any provision contained within the loan documents are expressly rejected in favor of the provisions contained within the loan documents.

(Doc. #215, ¶ 16).

The notes and deeds of trust are the loan documents "being executed herewith". They are not ambiguous. The deeds of trust clearly identify Gordon and Shirley Hitchcock *and* Hitchcock One as trustors. Gordon and Shirley signed each deed of trust twice, once individually and once as members of Hitchcock One. The legal descriptions in the deeds of trust include land owned by both Hitchcock One and Gordon and Shirley. The deeds of trust contain cross-collateralization clauses.[36] AMC did not act inequitably by relying upon the unambiguous language in its controlling loan documents.[37]

Even if the notes and deed of trust did not control, the plaintiffs' construction of the Loan Agreement fails. The debtor, a self-proclaimed "word nerd", testified he deems the word "shall" in the phrase "Security for loan #3 shall be … real estate" to be a command – a command the carryover note is the *only* loan which can be secured by real estate. The debtor's construction is not valid.

"Shall" is ambiguous. As noted above, "[a] contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings." *Bierman*, 943 N.W.2d at274. "Shall" is a particularly poor word for legal documents. "Shall" has various meanings,

---

[36] The plaintiffs take issue with the fact the notes each list only one type of collateral, and only the carryover note states it is secured by land. But that is how cross-collateralization clauses work. When effective, they allow a lender not to list every item of collateral on every document. AMC's policy of listing specific collateral on each note does not change the analysis. It also had a policy of using cross-collateralization clauses.

[37] Even if the documents were ambiguous, the court would not find inequitable conduct. AMC asserted its position as to cross-collateralization, which position was not invalid even if Pinkerton disagreed with it. The debtor had an opportunity to object to the claims or to contest the effect of the cross-collateralization clauses during his first bankruptcy case.

including "has a duty to", "is required to", "should", "may", "will", and "is entitled to". *See* Black's Law Dictionary (11th ed. 2019).[38]

"Shall" is not a command, duty, or requirement in the Loan Agreement. No one is commanded or required. No one undertakes a duty. The agreement states its terms are "mutually agreed between the parties." The subject of the specific sentence containing "shall" is "Security to be given". The security to be given cannot be commanded or required. The security cannot undertake a duty. In the Loan Agreement, "shall" clearly means "will", which is consistent with the recitals on the first page of the agreement.

But "shall" and "will" do not mean "shall *only*" or "will *only*".[39] Nothing in the Loan Agreement states AMC cannot secure its loans with other collateral. Nothing in the Loan Agreement precludes AMC from using a cross-collateralization clause. The Loan Agreement is simply not a command or agreement AMC must secure *only* the carryover note with land. As such, AMC's failure to attach the Loan Agreement to its proofs of claim did not rise to fraud or fraudulent concealment for purposes of subordination.

Failure to attach is also not grounds to subordinate AMC's claims. Subordination for failure to attach is "inconsistent with other provisions of the Bankruptcy Code." The remedy for failure to attach is in the Bankruptcy Rules. If the claimant does not attach required documents, the rules provide the court *may* take either or both of the following actions:

> (i) preclude the holder from presenting the omitted information, in any form, as evidence in any contested matter or adversary proceeding in the case, unless the court determines that the failure was substantially justified or is harmless; or

> (ii) award other appropriate relief, including reasonable expenses and attorney's fees caused by the failure.

Fed. R. Bankr. P. 3001(c)(2)(D). Subordination is not "other appropriate relief".

The term "other appropriate relief" as used in Rule 3001(c)(2) is not defined. Under customary rules of construction, "other appropriate relief" is construed

---

[38] The ambiguity of "shall" is clear. For example, if I say, "I shall eat eggs for breakfast", it is not a command I eat eggs for breakfast. Nor do I undertake a duty to eat eggs.

[39] If "I shall eat eggs for breakfast", I do not commit to only eat eggs. I am also not precluded from eating bacon during breakfast or from eating eggs at dinner.

to allow a remedy of the same character as the specifically enumerated example of "reasonable expenses and attorney's fees caused by the failure."

. . .

While the Rule may allow the courts to fashion a remedy other than the exclusion of evidence and the award of attorneys' fees, the remedy must bear a rational relationship to the violation of the rule and cannot give the debtor a windfall for a technical violation that caused no harm.

*Casamatta v. Resurgent Cap. Servs., L.P. (In re Freeman-Clay)*, 578 B.R. 423, 445 (Bankr. W.D. Mo. 2017) (citations omitted); *In re Reynolds*, 470 B.R. 138, 144 (Bankr. D. Colo. 2012) ("The intent of the rule is clear that the courts are limited to penalizing a creditor's non-compliance with Rule 3001(c) only by taking one or both of the measures set out in Rule 3001(c)(2)(D)(i) and (ii). Those are the exclusive remedies."). In this case, subordination for non-attachment does not bear a rational relationship to the violation. Even if subordination for non-attachment was consistent with the Code, the court would not do so. The Loan Agreement does not support the plaintiffs' argument AMC and its board knew *only* the carryover note was secured by land or its argument AMC fraudulently asserted otherwise.

Pinkerton's emails regarding the extent of the security do not make AMC's conduct inequitable or fraudulent. Pinkerton believed the cross-collateralization clauses did not affect the other two loans because the loans were closed before the deeds of trust were signed. This is the only explanation she gave to her coworkers, AMC's board, and AMC's attorneys. Pinkerton's legal analysis was wrong.[40] AMC's attorneys told her so. They told her the court viewed things "globally". AMC's attorneys signed off on the position and the debtor and his attorney ultimately agreed with them.[41] Pinkerton's skepticism does not create fraud or inequitable conduct.[42]

AMC's communications and agreements with the FSA do not rise to inequitable conduct.[43] The application, commitment, and guaranty documents do not list land as collateral. The documents do not state how collateral sale proceeds are to be divided. These facts are unremarkable. In 2016, when the FSA guaranteed loan was

---

[40] The cross-collateralization clause could secure the prior loans if the parties so intended.

[41] The court refused to allow the debtor and his parents to depose AMC's attorneys based upon attorney-client and work product privileges. The evidence at trial justified the decision. Pinkerton's testimony as to what she told AMC's attorneys was unequivocal. She did not put them on notice of any defense to the parol evidence rule.

[42] Pinkerton's skepticism fully explains the non-accrual of interest, the write downs, and the emails stating AMC could be under-secured.

[43] For the avoidance of doubt, each claim of inequitable conduct is insufficient viewed separately and collectively, and under any burden of proof.

originated, it was not secured by land. The loan did not become secured by land until the deeds of trust were signed two years later. The plaintiffs offered no evidence of how the FSA handles a subsequent grant of collateral. The argument the deeds of trust only secured the unguaranteed portion of the land is also not persuasive. The deeds of trust contain no such limitation. While AMC stated in some reports to the FSA, including the application for payment, the only collateral was personal property collateral, other contemporaneous communications indicate AMC informed the FSA about potential land collateral.

The foregoing is not dispositive land could not serve as collateral for the FSA loan. If the debtor's parents intended to pledge the real estate for the FSA loan, nothing in the regulations invalidates the lien even if AMC did not document it correctly. In such a case, AMC could face negative consequences. For example, in cases of actual fraud or misrepresentation by the lender, the FSA may contest the guarantee. *See* 7 CFR 762.103. But this is between AMC and the FSA. In sum, the FSA communications established the unremarkable position the loan was not secured by real estate when it was originated. The communications did not establish AMC committed fraud in relying upon cross-collateralization clauses in documents the plaintiffs signed after the FSA loan was originated.

The proofs of claim filed in the second case, though inconsistent, do not establish fraud or inequitable conduct. The claims were filed after plaintiffs' counsel asserted the Loan Agreement conflicted with the cross-collateralization clauses and after counsel threatened AMC with lawsuits. AMC was in a no-win position. AMC took a cautious, investigatory approach in filing its claims in the second case. This approach was held against AMC as evidence it engaged in inequitable conduct in the first case. Had AMC initially filed the claims as secured in the second case, plaintiffs' counsel could assert AMC engaged in continued inequitable conduct.

For the reasons stated above, the bank's conduct, without considering the debtor's conduct, does not support subordination. When considering the debtor's conduct, subordination is untenable. "[O]ne of the first questions that must be asked before any equitable doctrine can be applied is 'whether he who seeks equity has done equity.'" *Williams v. Citifinancial Mortg. Co. (In re Williams)*, 256 B.R. 885, 897 (B.A.P. 8th Cir. 2001). The debtor has not done equity. Most notably, he stipulated to cross-collateralization in the first bankruptcy case, purportedly without telling his parents, and despite remembering the closing and despite possessing a copy of the singular document he contends supports his position. He either informed Gordon of the nature of the collateral pledge, or he concealed it from his parents.

Gordon and Shirley contend they are not judicially estopped by the debtor's conduct or stipulation in the first case. Judicial estoppel is not the issue. The debtor is not equitably entitled to the equitable remedy sought – subordination of AMC's claims and transfer of AMC's liens to the bankruptcy estate. The debtor should not benefit

under the circumstances, regardless of whether the legal claim is brought by the debtor or his parents.

### Disallowance

The debtor requests AMC's claims be disallowed due to negligent misrepresentations and fraud. Disallowance is not appropriate. Allowance of claims is governed by 11 U.S.C. § 502. Under § 502(b), a claim should be allowed except for the specific reasons enumerated. Fraud and negligent misrepresentations are not enumerated. The debtor did not identify the court's authority to disallow under these circumstances. As a general matter, the court has some equitable powers. *See* 11 U.S.C. § 105(a) (stating a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."). It also may have "inherent power . . . to sanction 'abusive litigation practices.' *Law v. Siegel*, 571 U.S. 415, 420-21 (2014) (citations omitted).

The court's equitable powers are not unlimited. "[I]n exercising those statutory and inherent powers, a bankruptcy court may not contravene specific statutory provisions." *Id.* To disallow the claim would contravene statutory section 502(b), which enumerates the grounds for disallowance. It also contravenes Bankruptcy Rule 3001. *See* Fed. R. Bankr. P. 3001 advisory committee's note to 2011 Amendment I ("Failure to provide the required information does not itself constitute a ground for disallowance of a claim."); *see also Reichel v. Jensen-Carter (In re Reichel)*, 645 B.R. 620, 625 (B.A.P. 8th Cir. 2022) ("It is well-established in the Eighth Circuit that even if a proof of claim has not substantially complied with the documentation requirements of Rule 3001, the claim is still allowed unless the debtor establishes an exception under § 502(b)."). Even if the court could disallow AMC's claims, disallowance is not appropriate for the same reasons subordination is not appropriate.

### Rescission and Reformation

The plaintiffs contend the deeds of trust should be rescinded or reformed due to fraud or mutual mistake. On the other hand, AMC contends, "If negotiations between the parties result in an agreement which is reduced to writing, the written agreement is the only competent evidence of the contract in the absence of fraud, mistake, or ambiguity." *Sederstrom v. Burge*, 343 N.W.2d 770, 771 (Neb. 1984). But plaintiffs allege mistake, which is an exception to the parol evidence rule.

> The parol evidence rule renders ineffective proof of a prior or contemporaneous oral agreement which alters, varies, or contradicts the terms of a written agreement. *The parol evidence rule is ordinarily applied in absence of fraud, mistake, or ambiguity*.

*Five Points Bank v. White,* 437 N.W.2d 460, 462 (Neb. 1989) (citations omitted) (emphasis added).[44]

Rescission and reformation differ. "Both reformation and rescission are equitable remedies that can relieve a party from performing obligations under a contract or an apparent contract. However, although reformation and rescission have been described as "analogous," they differ in their bases and effects." *Hardy v. Wiggins (In re Estate of Wiggins)*, 992 N.W.2d 429, 435 (Neb. 2023).

> Rescission … may be granted where the parties have apparently entered into a contract evidenced by a writing, but owing to a mistake, their minds did not meet as to all the essential elements of the transaction, so that no real contract was made by them.

*Id.* at 436. "The purpose of rescission is to place the parties in a status quo, that is, return the parties to their position which existed before the rescinded contract." *deNourie & Yost Homes, LLC v. Frost*, 893 N.W.2d 669, 682 (Neb. 2017). Rescission is not appropriate in this case because the parties agreed to the essential elements of the transaction. Also, the parties cannot be placed back to the status quo.

Unlike rescission, reformation applies when the parties had a meeting of the minds.

> For purposes of reformation, a mutual mistake exists where there has been a meeting of the minds of the parties and an agreement actually entered into, but the agreement in its written form does not express what was really intended by the parties.

*In re Estate of Wiggins*, 992 N.W.2d at 435.

Reformation "correct[s] an erroneous instrument to express the true intent of the parties to the instrument. *Id.*

> To overcome the presumption that the agreement correctly expresses the parties' intent and therefore should be reformed, the party seeking reformation must offer clear, convincing, and satisfactory evidence. Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.

*R & B Farms, Inc. v. Cedar Valley Acres, Inc.*, 798 N.W.2d 121, 129 (Neb. 2011) (citations omitted). The fact one of the parties denies a mistake was made is not dispositive and does not preclude reformation. *See id.*

---

[44] Although the plaintiffs allege fraud, they did not establish fraud in the inducement.

Also, cross-collateralization clauses, also known as dragnet clauses, "are not favored in equity and are carefully scrutinized and strictly construed." *O'Neill Prod. Credit Ass'n v. Mitchell*, 307 N.W.2d 115, 118 (Neb. 1981). Such clauses "will, in the absence of other legal prohibition, be enforced to the extent they are determined to have been within the intent of the parties." *Id.*

Reformation is appropriate in this case to remove the cross-collateralization clauses from the deeds of trust. There is clear and convincing evidence Pinkerton represented the documents did not secure all the debtor's debts. There is clear and convincing evidence AMC and Gordon and Shirley Hitchcock agreed only the carryover note would be secured by real estate. The cross-collateralization clauses were clearly and convincingly not within the intent of the parties.

Shirley testified she and Gordon intended only to pledge land to secure the $1,200,000 carryover note. At closing Shirley asked Pinkerton whether she and Gordon were going to get "hung on" her son's other debts. Pinkerton assured her they would not. AMC did not inform Shirley or Gordon two other loans existed or the amount of the indebtedness. Shirley did not recall discussing the cross-collateralization clause at closing. Although Pinkerton's testimony varied a little, she supported Shirley's position the parties intended the only loan secured by real estate was the carryover note. AMC's conduct and internal communications after the closing also support reformation. AMC only changed its position based upon a good faith review by its attorneys and a stipulation from the debtor and his attorney.

AMC's other witnesses do not change the conclusion. Grant Pedersen, AMC's former director of lending, testified all loans are cross-collateralized and no exceptions are made. But CEO Karl Randecker testified AMC had no such policy and it would remove a cross-collateralization clause if it wanted the loan badly enough. Pinkerton concurred with Randecker - AMC's general practice was to include the clause in deeds of trust, from which they seldom deviated.[45]

Although reformation is appropriate to remove the cross-collateralization clause, it is not appropriate to remove land owned by Gordon and Shirley or to reduce the number of acres pledged. Pinkerton was adamant the legal descriptions in the deeds of trust were accurate and all the land was pledged. For her part Shirley merely assumed personal land was not being pledged as security. Pinkerton never informed

---

[45] Pedersen testified the cross-collateralization language is in all AMC deeds of trust and cannot be removed in the software. Pinkerton testified the software allowed the clause to be removed, which appears to be the case. (Doc. #355). Pedersen's testimony, if true, supports the clause is boilerplate and should be reformed as inconsistent with the parties' intent.

any of the plaintiffs otherwise. Shirley also admits she did not discuss the pledge of real estate with the debtor. Gordon and the debtor discussed the pledge.[46]

Despite his testimony to the contrary, the debtor clearly understood his parents were pledging all the real estate identified in the deeds of trust. The debtor provided AMC the legal descriptions. When questioned, by email, the debtor told AMC his parents were willing to pledge their personal land. The debtor was aware the legal descriptions covered more than 154 acres. Of the witnesses who testified at trial, the debtor was the least credible.[47]

Even though reformation is granted, it does not change the fact AMC acted equitably in the first bankruptcy case, this case, in the state court case, and in its dealings with the Hitchcocks. "A claim might have been asserted by a creditor in good faith even if the claim was later successfully disputed by the debtor or disallowed by the bankruptcy court." *In re Anthony*, 481 B.R. 602, 627 (D. Neb. 2012). In addition, while the effect of reformation relates back to the date the deeds of trust were executed, the remedy is "not accomplished in equity until the court so decrees." *Holoubek v. Romshek*, 749 N.W.2d 901, 910 (Neb. Ct. App. 2008). The remedy of reformation is accomplished with this order. Before then, AMC acted equitably in relying upon the language in its deeds of trust.

## Conclusion

The deeds of trust securing AMC's claims are reformed to remove the cross-collateralization clauses. The land identified in the deeds of trust is security for only

---

[46] Shirley's contention she did not have time or plat maps to verify legal descriptions is unavailing. Shirley knew she was signing deeds of trust. She could have brought plat maps to the closing. Shirley also testified she and Gordon were not parties to the first bankruptcy. This appears incorrect. Gordon is listed in the petition as a co-debtor and on the mailing matrix. If Shirley was not notified of the bankruptcy as she contends, she should look no further than her son and his bankruptcy counsel in the first case.

[47] The debtor was at times evasive. His testimony was at times expedient. When questioned about his e-mail correspondence with AMC stating his parent's personal land would be collateral, he proffered he was no longer using the email address. But he was shown using it months later. He claims he only read the Loan Agreement at closing, the single document he deems supportive of his position. He had a copy of the Loan Agreement when he filed his first bankruptcy. But somehow AMC and its attorneys concealed it from him. He remembered Pinkerton stating the loans were not cross-collateralized when he filed his first bankruptcy case. But he stipulated to cross-collateralization because his mental state allowed his attorney to convince him otherwise. He prefaced his testimony as to the meaning of the word "shall" by voluntarily describing himself as a "word nerd", presumably hoping the court would give his construction greater weight than it is entitled.

the $1.2 million carry-over note.[48] All other requested relief is denied. Each party must pay his, her, and its own attorney fees. Separate judgment will be entered.

Dated: June 25, 2024

BY THE COURT

/s/ Brian S. Kruse
Brian S. Kruse
Bankruptcy Judge

---

[48] This order does not affect the pledge of the membership interest in Hitchcock One LLC as collateral for any other loan.